**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: MOUNTAIN LAUREL RESOURCES
COMPANY, A CORPORATION,
Debtor.

MINE MANAGEMENT, INCORPORATED;
LEWIS R. LAW,
Plaintiffs-Appellants,

v.

ROY V. WOLFE, III,
Trustee - Appellee,

FEDERAL INSURANCE COMPANY;
FIREMAN'S FUND INSURANCE COMPANY;
AMERICAN EMPIRE SURPLUS LINES
INSURANCE COMPANY; CONTINENTAL

INSURANCE COMPANY; TWIN CITY FIRE
INSURANCE COMPANY; FIRST STATE
INSURANCE COMPANY; CAMDEN FIRE
INSURANCE ASSOCIATION; DIVISIONOF
ENVIRONMENTAL PROTECTIONOFTHE
WEST VIRGINIA DEPARTMENTOF
COMMERCE, LABORAND
ENVIRONMENTAL RESOURCES; TOWNOF
FAYETTEVILLE; CSX CORPORATION;
CSX MINERALS, INCORPORATED, CSX
TRANSPORTATION, INCORPORATED;
TRANSCONTINENTAL INSURANCE
COMPANY; FIDELITYAND CASUALTY
COMPANYOF NEW YORK; BUCKEYE
UNION INSURANCE COMPANY,
Parties in Interest-Appellees.

No. 99-1876

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
Robert C. Chambers, District Judge.
(CA-99-180-5, BK-93-50398,
AP-96-125)

Argued: January 27, 2000

Decided: April 3, 2000

Before NIEMEYER, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
Frederic N. SMALKIN, United States District Judge
for the District of Maryland, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Charles Edward Hurt, LEWIS LAW AND MINE MAN-
AGEMENT, INC., Charleston, West Virginia, for Appellants. Ste-
phen L. Thompson, BARTH, THOMPSON & GEORGE, Charleston,
West Virginia, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Mine Management, Inc. (MMI) and Lewis Law (Law) appeal from
the district court's dismissal of their appeal as equitably moot from

2

a bankruptcy court order. In this appeal, MMI and Law assert that the bankruptcy court lacked jurisdiction and authority to issue its order and that the district court erred in its finding of equitable mootness. For the reasons stated below, we hold that the bankruptcy court had jurisdiction and authority to issue its order and that the district court did not err in dismissing the case as equitably moot.

I

This appeal arises from a complex fifteen-year history of litigation concerning the environmental cleanup of a 241-acre site in Fayette County, West Virginia. Throughout the 1900s, the site, known as "Summerlee," was used for the dumping of refuse (by-products from coal processing). Prior to 1980, the site was owned by the New River Company (New River), whose name was later changed to Mountain Laurel Resources Company (Mountain Laurel).[1] New River was owned by Western Pocahontas Company, which was later purchased by the CSX Corporation and its subsidiaries (collectively the CSX entities). The dumping of refuse at Summerlee resulted in a refuse pile that was approximately 100 feet of "gob" spread over a substantial area of the site. (J.A. 179). Because of the nature of the refuse, as water percolated through the pile of gob, the water accumulated contaminants known as acid mine drainage (AMD).

In 1977, Law formed MMI to engage in various coal-related business activities.[2] As part of its activities, Mountain Laurel leased some surface rights at Summerlee to MMI and Law who, in turn, assigned those rights to Princess Cindy Mining Company for the purpose of processing the gob, removing pond fines to blend with coal, and selling the coal refuse. In 1978, the State of West Virginia (the State) required Mountain Laurel to install a treatment plant to treat and mitigate the AMD.

On April 1, 1980, Mountain Laurel sold a portion of the surface rights of Summerlee to MMI. The sale included the preparation plant,

_____

[1] Because New River and Mountain Laurel are essentially the same company and represent the same interests, where appropriate this opinion refers to them collectively as Mountain Laurel.
[2] Law is the sole shareholder of MMI.

3

a series of ponds, the gob pile, and a water treatment system.**3** At the time MMI purchased the site, the water treatment system was subject to a National Pollution Discharge Elimination System (NPDES) permit obtained by New River.**4** Despite repeated notice, however, neither MMI nor Law ever applied for an NPDES permit authorizing discharges into Wolf and Arbuckle Creeks. Due to MMI and Law's failure to operate the water treatment system effectively, AMD was discharged from the collection pond into Wolf Creek, or from the second settling pond into Arbuckle Creek, on at least sixteen occasions between March 1987 and November 15, 1991. MMI and Law were indicted, tried before a jury, and convicted of violating the Clean Water Act, 33 U.S.C.A. § 1319(c)(2). Law was sentenced to two years in prison and MMI and Law were fined $80,000 each; both convictions were upheld on appeal by this court in United States v. Law, 979 F.2d 977 (4th Cir. 1992).

From 1984 to 1993, the State and the Town of Fayetteville, West Virginia (the Town) filed a series of civil suits in the Circuit Court of Fayette County (the state circuit court) against Mountain Laurel, the CSX entities, MMI, and Law seeking: (1) injunctive relief to compel abatement of water contamination caused by the gob pile and (2) damages arising from remedying the pollution.**5** In response to these

_____

**3** In the deed conveyed to MMI, a provision provided that MMI assumed "any and all liability, present and future, . . . for all environmental and safety matters, including but not limited to, air pollution [and] water pollution . . . arising out of the ownership or use of the property conveyed, which includes all possible future claims that may be asserted by . . . [State and Federal agencies]." (J.A. 12-13).

**4** The water treatment system was designed to reduce the AMD content of drainage from the gob pile. The system was comprised of a collection pond near Wolf Creek, a pump, and piping that channeled the collected water over a ridge and through a hopper, which dispensed soda ash briquettes to raise the pH of the water. Iron and manganese then precipitated out as the water flowed through two settling ponds before its discharge into Arbuckle Creek.

**5** The State's claim for damages was premised on its incurring $2,100,000 in costs to remediate the site by lessening the percolation of water through the gob pile and eliminating four ponds contaminated with AMD that discharged into Wolf Creek. In addition, the State and the Town sought prospective relief for the continuing costs of remediation.

4

suits, MMI and Law filed and served third-party complaints seeking indemnification from Mountain Laurel and the CSX entities. In addition to the indemnification claims, MMI and Law asserted claims of fraud against Mountain Laurel and the CSX entities for fraudulently conveying the Summerlee site which resulted in MMI incurring extensive liability and Law being imprisoned.[6] In 1995, the state circuit court entered a judgment in favor of the State against MMI and Law as to their liability. The State, however, did not pursue a damages determination because of the settlement discussions in this case.

In 1993, Mountain Laurel filed a Chapter 11 petition for bankruptcy protection.[7] At the time of the bankruptcy filing, Mountain Laurel was still a defendant in the state court litigation between the State, the Town, the CSX entities, MMI, and Law. Based on the state court litigation, the State, the Town, MMI, and Law filed proofs of claim against Mountain Laurel asserting rights to its bankruptcy estate. In response to those claims against the estate, the Trustee, in administering the bankruptcy estate, initiated an adversary proceeding seeking a declaration of rights, under certain insurance policies, as to Mountain Laurel's coverage and its right to recover its defense costs in defending against the state court litigation. In the complaint, the Trustee alleged that: (1) the bankruptcy court had jurisdiction under 28 U.S.C.A. §§ 157, 1334; and (2) the matter was a core proceeding under 28 U.S.C.A. § 157(b)(2)(A)-(B), (E), (O).

The State and the Town, together with MMI and Law, jointly moved to intervene in the adversary proceeding as plaintiffs against the insurers; the bankruptcy court granted that motion. As plaintiffs, the Trustee, the State, the Town, MMI, and Law sought to have the bankruptcy court determine the insurers' liability and each party's rights to the proceeds, if any, from the insurance policies. The insurers denied coverage based upon a variety of reasons.

_____

[6] MMI and Law claim that Mountain Laurel made false statements and engaged in other fraudulent conduct in order to prevent MMI and Law from discovering the pollution problems at Summerlee. MMI and Law's claims against the CSX entities are premised on the theory that the CSX entities are the alter ego of Mountain Laurel

[7] The bankruptcy was later converted to a Chapter 7 proceeding.

Over the course of several months, the Trustee engaged in lengthy and complex negotiations in an effort to resolve the various disputes among the parties. Because of the inter-relationship between the adversary proceeding, the bankruptcy claims, and the state court litigation, it was necessary to involve numerous parties not parties to the bankruptcy proceeding. Although not involved in the bankruptcy case or in the adversary proceeding but involved as defendants in the state court litigation, the CSX entities voluntarily participated in the settlement discussions. Other parties, such as citizens groups of riparian landowners along Wolf Creek and representatives of the National Park Service and the Federal Office of Surface Mining were not actual parties to any of the court proceedings or to the settlement itself, but nevertheless participated in the settlement negotiations. Despite invitations by the Trustee and admonitions by the bankruptcy court to participate in settlement negotiations, MMI and Law refused to participate. After several months, the Trustee was able to fashion a proposed settlement and compromise that was acceptable to all parties except MMI and Law. MMI and Law refused to sign the settlement agreement.

Under the terms of the proposed settlement, the insurers and the CSX entities were required to pay to the Environmental Claim Fund of the estate the total sum of $850,000. Of this amount the estate would retain $100,000 for reimbursement of the fees and costs it expended in the state court litigation. These funds were also to be available for payment of other claims and administrative expenses of the estate. The remaining balance of $750,000 would be paid by the estate to the State and the Town in full satisfaction of their environmental claims against the estate, Law, MMI, and the CSX entities.

In return for receiving distributions from the estate, the State and the Town agreed to release MMI and Law from liability for the State's costs in remediating Summerlee and the Town's claim for damages to its water supply. In return for the insurers' payment of funds to the estate, the State, the Town, Mountain Laurel/the Trustee, MMI, and Law were to release the insurers from liability. Similarly, in return for the CSX entities' contribution to the estate, the CSX entities and Mountain Laurel were to be released "from any and all duties, liabilities, responsibilities, or obligations of every kind and nature, known or unknown, past, present and future related to the Summerlee

6

Site under or arising out of Mountain Laurel's and the CSX Entities' interest or alleged interest in or arising out of the [insurance] Policies." (J.A. 201). Finally, the benefit the settlement agreement was to provide to MMI and Law was relief from the judgment already entered by the state circuit court in favor of the State for the costs of remediating Summerlee. In addition, MMI and Law would be released from similar claims of the Town and the indemnity claims of the estate, as well as indemnity, contribution, and subrogation claims of the insurers and the CSX entities who might be called upon to satisfy the claims of the estate and then look to MMI and Law.

To ensure that no one interfered with the settlement agreement, the bankruptcy court issued a permanent injunction prohibiting "any person from attempting to pursue any of the claims released by the terms of the Settlement Agreement or from interfering, in any respect, with the implementation of the terms of the Settlement Agreement." (J.A. 187). The injunction, therefore, enjoined MMI and Law from pursuing the state court litigation against Mountain Laurel and the CSX entities.

The parties participating in the settlement agreement moved the bankruptcy court to approve the settlement but MMI and Law objected. On January 28, 1999, the bankruptcy court conducted an evidentiary hearing on the motion and, on February 10, 1999, the bankruptcy court issued an order (the settlement order) approving the settlement agreement.

In response to MMI and Law's objections, the bankruptcy court concluded that "the settlement provides for a distribution to MMI and Law upon their Claim which exceeds that which they could be expected to receive from the Trustee from the assets of the estate upon a final distribution." (J.A. 185). With respect to MMI and Law's fraud claims against Mountain Laurel, the bankruptcy court determined that those claims were still viable but that MMI and Law would have to assert them against the estate in bankruptcy court if, at a later time, it was determined that there were funds available for distribution to general unsecured creditors.[8]

_____

[8] The bankruptcy court's order does not make reference to the status of MMI and Law's fraud claim against the CSX entities. However, the

7

On February 12, 1999, MMI and Law filed a notice of appeal from the bankruptcy court's order. In response to MMI and Law's notice of appeal, on March 4, 1999, the State and the Town filed a motion to dismiss the appeal on the grounds of legal and equitable mootness. The State and the Town's motion to dismiss was originally filed with the United States Bankruptcy Court for the Southern District of West Virginia, but was forwarded later to the United States District Court for the Southern District of West Virginia on March 5, 1999.

On May 17, 1999, the district court held a hearing on the State and the Town's motion to dismiss the appeal on the grounds of legal and equitable mootness. On June 7, 1999, the district court issued an order granting the State and the Town's motion to dismiss, finding that MMI and Law's appeal to the district court was equitably moot. The district court concluded that reversing the settlement agreement and order on appeal would "be manifestly unjust to both the parties and the citizens who waited so long for the pollution in Wolfe [sic] Creek to be rectified." (J.A. 289). The district court focused on MMI and Law's failure to apply for a stay of the bankruptcy court's proceedings, which in turn permitted the bankruptcy court to allow distribution of the funds by the Trustee. In addition, the district court concluded that if it reversed the portion of the settlement agreement releasing the CSX entities from any claims MMI and Law had against them, such a decision "undoubtedly would affect the substantial rights of the CSX entities by subjecting them to additional litigation," and that doing so would likely result in "unraveling the entire settlement agreement." (J.A. 288).

Finally, the district court looked to the public interest in abating the water pollution. The district court noted that, although the State had performed some land remediation of Summerlee, the settlement proceeds were needed to conduct water remediation. It further noted that the riparian landowners along Wolf Creek, and the citizens' drinking water from Wolf Creek, had already endured fifteen years of litigation waiting for a resolution. Based on this public interest, the CSX enti-

_____

court's interpretation of the settlement agreement as not affecting the viability of MMI and Law's fraud claims against Mountain Laurel appears to indicate that MMI and Law's fraud claims against the CSX entities may still be viable in the bankruptcy court.

8

ties and the insurers' payment of the funds to the Trustee, the Trustee's disbursement of those funds to the State and the Town, and issuance of the various releases, the district court concluded that the appeal was equitably moot.

On June 17, 1999, MMI and Law noticed a timely appeal.

II

This court is presented with two issues: (1) whether the bankruptcy court had jurisdiction and authority to enjoin, by way of enforcement of the settlement agreement, MMI and Law from proceeding with their suit against Mountain Laurel and the CSX entities in state court; and (2) whether review of the merits of the settlement agreement is now equitably moot because the agreement has been consummated. We address these issues in turn.

A

MMI and Law argue that the bankruptcy court lacked jurisdiction and authority to enjoin their state court litigation against the CSX entities because: (1) the Trustee's adversary proceeding against the insurers was a non-core proceeding in which the bankruptcy court could only propose findings of fact and conclusions of law; and (2) the injunction effectively discharges MMI and Law's claims against a nondebtor third-party, i.e., the CSX entities. We disagree.

The United States district courts possess original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C.A. § 1334(b) (West 1994). "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." Id. § 157(a);[9] see United States v. Wilson, 974 F.2d 514, 516 (4th Cir. 1992). Once jurisdiction is established under § 1334 and a case has been referred to the bankruptcy court under § 157(a), the

_____

[9] The United States' bankruptcy laws are codified in Title 11 of the United States Code. See 11 U.S.C.A. §§ 101-1330 (1994).

bankruptcy courts are granted authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C.A.§ 157(b)(1) (emphasis added); see Wilson, 974 F.2d at 516. With respect to non-core proceedings that are related to a case under Title 11, however, bankruptcy courts are limited to hearing the proceeding and submitting proposed findings of fact and conclusions of law to the district court for entry of a final order or judgment unless the parties consent otherwise. See 28 U.S.C.A. § 157(c)(1). In granting relief in cases properly before it, the bankruptcy court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Title 11. 11 U.S.C.A. § 105(a) (West 1993).

The proceeding at issue in this appeal is the Trustee's claim against Mountain Laurel's insurers for the Trustee's fees and costs in defending the estate against the claims resulting from the pollution problems at Summerlee. The State, the Town, MMI, and Law intervened in the Trustee's proceeding against the insurers as plaintiffs asserting, inter alia: (1) that their claims were so related to the claim raised by the Trustee that they form part of the same case or controversy; (2) that intervention was necessary to secure their ability to protect their respective interests; and (3) that the Trustee's claim was situated such that, disposition of it absent allowing intervention, would have impaired or impeded the State, the Town, MMI, and Law's ability to protect their interests. The State, the Town, MMI, and Law sought to have the bankruptcy court afford them relief by making the proceeds of the policies available to satisfy their claims against Mountain Laurel, which were the same claims these parties asserted against Mountain Laurel in the state court litigation. It follows that the issues of what amount the insurers owed, which claimants were entitled to a portion of any proceeds awarded to the estate of Mountain Laurel, and the merits of the state court litigation were squarely before the bankruptcy court. Accordingly, the Trustee's claim against Mountain Laurel's insurers is, at a minimum, related to a Title 11 case, and therefore, jurisdiction was proper. See 28 U.S.C.A. § 1334(a); 1 Collier on Bankruptcy ¶¶ 3.01[4][c][ii]-[iv], at 3-23 to 3-29 (Matthew Bender 1999).

With respect to the bankruptcy court's authority to hear and determine the Trustee's claims against Mountain Laurel's insurers, even if

10

we accepted MMI and Law's argument that this proceeding was a non-core proceeding, it is clear that MMI and Law consented to the bankruptcy court's authority to determine the issues raised by the various claimants. See Canal Corp. v. Finnman (In re Johnson), 960 F.2d 396, 403 (4th Cir. 1992) ("Under § 157(c)(2) a bankruptcy court may enter appropriate orders and judgments in non-core related matters where such matters are referred by the district court and it has the consent of all the parties." (footnote omitted)). By intervening in the Trustee's adversary proceeding against the insurers, MMI and Law, in effect, requested the bankruptcy court to determine the validity of their claims and their rights to indemnification from Mountain Laurel on the State's and the Town's claims against MMI and Law for remedying the pollution. See In re Johnson, 960 F.2d at 403 (holding that a party impliedly consents to entry of judgment by the bankruptcy court in a non-core proceeding where the party fails to object to the bankruptcy court's treatment of the proceeding as core); see also M.A. Baheth & Co. v. Schott (In re M.A. Baheth Constr. Co.), 118 F.3d 1082, 1084 (5th Cir. 1997) ("Furthermore, by failing to object to the bankruptcy court's assumption of core jurisdiction, Baheth impliedly consented to the court's entry of final judgment."). A determination of the validity of MMI and Law's indemnification claims necessarily requires the bankruptcy court to evaluate the merits of all the parties' claims. Thus, the bankruptcy court had little choice but to exercise its authority over the entire state court litigation, including MMI and Law's alter ego claim against the CSX entities.

MMI and Law also argue that the bankruptcy court lacked the authority under 11 U.S.C.A. § 105(a) to enjoin their suit against the CSX entities because the CSX entities are nondebtor third-parties. The bankruptcy court, however, has authority to "`enjoin parties other than the bankrupt' from commencing or continuing litigation." A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.), 788 F.2d 994, 1002 (4th Cir. 1986). A.H. Robins makes clear that a bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate. See id. at 1005, 1008. In this case, both of these circumstances are present, and the bankruptcy court had authority to enjoin MMI and Law's claims against the parties to the settlement agreement.

11

B

Having determined that the bankruptcy court (1) had jurisdiction under 28 U.S.C.A. § 1334 over the Trustee's adversary proceeding against the insurers, (2) had the authority under 28 U.S.C.A. § 157 to determine the issues raised in the proceeding, and (3) had the authority under 11 U.S.C.A. § 105(a) to issue an injunction against alleged third-party nondebtors, we turn to the issue of whether MMI and Law's challenge to the merits of the bankruptcy court's settlement order is equitably moot. Upon review of the briefs and the record, and after consideration of oral arguments, we conclude that the district court correctly held that MMI and Law's appeal from the bankruptcy court's settlement order was equitably moot for the reasons stated in its opinion. See Law v. Wolfe (In re Mountain Laurel Resources Co.), Civ. A. No. 5:99-0180 (D. W. Va. June 9, 1999).

III

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED